UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| BRIDGESTONE/FIRESTONE<br>NORTH AMERICAN TIRE, LLC, | : | Hon. Joseph H. Rodriguez |
| Plaintiff, | : | Civil Action No. 05-2830 |
| v. | : | |
| FRANK LePORE, LORRAINE FUREY, and<br>PACIFIC TRAIL OPERATIONS, INC., | : | MEMORANDUM OPINION<br>& ORDER |
| Defendants. | : | |

This matter is before the Court on cross-motions for summary judgment. Oral argument on the motions was held on December 11, 2007, and the record of that discussion is incorporated here by reference.  For the reasons set forth below, each motion will be granted in part and denied in part such that summary judgment is granted in favor of the Defendants on the Complaint and in favor of the Plaintiff on the Counterclaims.

## Background

The Complaint in this matter was filed on June 2, 2005 by tire manufacturer and distributor Bridgestone/Firestone North American Tire, LLC ("BFNT") to remedy an allegedly fraudulent scheme devised by Defendants to induce BFNT's predecessor in interest to pay invoices that contained falsified and duplicative charges for vehicle tires and transportation of tires.  Named as defendants are Frank LePore and his wife, Lorraine Furey, as well as a business owned by LePore, Pacific Trail Operations, Inc. ("Pacific Trail").  Jurisdiction of this Court is grounded on diversity of citizenship pursuant to 28 U.S.C. § 1332.

BFNT is the successor in interest to certain assets and liabilities formerly belonging to Bridgestone Retail & Commercial Operations, LLC ("BFRC").  (Compl. ¶ 8; Kenneth Weaver Dep., p. 23.)  BFRC's multi-brand subsidiary operation, GCR Tire, has operated the commercial company stores, including a tire dealership owned and operated under the name "Firestone C&F" ("C&F") which sold tires to vehicle owners in the retail market in Davenport, Iowa.  (Compl. at ¶¶ 8-10; Weaver Dep., p. 42; Frank Teten Dep., p. 9.)  All of the operations of C&F were closed in July 2004 and the assets and liabilities of C&F were acquired by BFNT from BFRC.  (Compl. at ¶8; John Taylor Dep., p. 132; Weaver Dep., p. 24.)  Upon acquiring C&F, BFNT conducted a physical inventory and audit, and allegedly discovered that it had overpaid BFRC on the book value of C&F, because there was not sufficient physical inventory to justify the book value that BFNT paid BFRC.  (Weaver Dep., p. 54-61.)  Upon further investigation, BFNT determined that the shortfall in the perceived value appeared to have been caused by freight charges on certain tire deliveries.  (Weaver Dep., p. 65.)

Englewood Tires Wholesale, Inc., owned by John Boyle, was an authorized wholesale and retail tire dealer with the non-exclusive right to purchase and re-sell Bridgestone/Firestone passenger and light truck tires, as well as other brands.  (Compl. at ¶ 12; John Boyle Dep., p. 9.)  Defendant Frank LePore was employed as a salesman and vice president of Englewood Tires, and was primarily responsible for wholesaling operations there before he ended his employ on March 24, 2004, purportedly because he was unhappy with his commission structure.  (Compl. at ¶ 13; Boyle Dep., p. 10, 95-96; LePore Dep., p. 36-37.)  As a salesman, LePore's responsibilities included negotiating purchases from tire manufacturers for Englewood Tires, and as a vice

president, he supervised in-house sales and negotiated programs with manufacturers. (Boyle Dep.,. p. 32; Frank LePore Dep., p. 21, 46.)  LePore also handled the C&F account as a salesman.  (Boyle Dep., p. 14.)

Plaintiff has alleged that from 2002 through the middle of 2004, LePore had arranged for Englewood Tires to sell truckloads of tires to C&F, for which Englewood Tires issued invoices that stated the price of the tires sold and the applicable federal excise tax.  (Compl. at ¶ 14.)  The price of the tires was negotiated by LePore and John Taylor, the general manager of C&F.  (LePore Dep., p. 72.)  As a salesman, LePore did not have to get Boyle's approval before negotiating the price of tires with purchasers such as C&F.  (Boyle Dep., p. 17.)  The cost of transportation associated with those sales, including the cost of transporting the tires to C&F in Davenport, Iowa, was included in the unit price of the tires stated on the invoices.  (Compl. at ¶ 14; Boyle Dep., p. 27, 45-46.)  BFRC division GCR paid all invoices sent by Englewood Tires to C&F.  (Compl. at ¶ 15; Teten Dep., p. 63; Weaver Dep., p. 136.)

The crux of the Complaint is that from February 2002 through June 2004 Defendants LePore and Furey caused Defendant Pacific Trail to issue numerous invoices to C&F for allegedly falsified freight charges associated with the sale of tires by Englewood Tires to C&F, with each invoice purportedly covering the transportation for one truckload of tires to C&F.  (Compl. at ¶¶ 16, 19.)[1]  It appears that Englewood and/or

---

[1]  Plaintiff points out that the invoices gave an Oregon address for Pacific Trail that actually was a mail drop, and Plaintiff alleges that the phone number for Pacific Trail provided on the invoices was actually a "pass-through" to LePore's cell phone in New Jersey.  (Compl. at ¶ 17.)  Further, most of the invoices included special instructions that directed C&F's general manager, John Taylor, to "[c]all F. LePore 48 [or later, 24] hours prior to trans-load delivery."  (Compl. at ¶ 18.)  Beside these

3

LePore sometimes purchased large numbers of Michelin truck and other tires from fleet owners[2] or other non-manufacturer secondary sources at prices lower than the dealers could purchase them from the manufacturers, and then resold the tires below the market price charged by the manufacturers.  (Boyle Dep., p. 76-77.)  As a customer of LePore's, C&F was therefore able to obtain tires at a much cheaper price through a proprietary deal with him.  (LePore Dep., p. 76-77.)  Utilizing this "gray market," and Pacific Trail, LePore apparently issued separate invoices to recoup approximately $10 per tire above the price at which Englewood Tires was willing to sell the tires.  (Boyle Dep., p. 48-57.)

The Pacific Trail invoices were mailed with the Englewood invoices.  (LePore Dep., p. 73.)  Because it was unusual to receive two separate invoices, at one point Taylor questioned LePore about them.  (Taylor Dep., p. 67.)  LePore responded that the Pacific Trail invoices represented brokerage or trans-loading fees associated with the delivery of each truckload of tires to C&F.  (LePore Dep., p. 93, 106-07.)  In connection with this litigation, however, LePore has testified that the Pacific Trail invoices really were for LePore's "services" in "getting C&F the tires at the price they agreed to pay," or in the nature of a sales commission.[3]  (LePore Dep., p. 91.)  At the time, LePore neither

---

allegedly suspicious circumstances, Pacific Trail invoices also showed the tires were being processed for acquisition on the west coast, but they were not always.  (LePore Dep., p. 274.)  GCR Tire Centers paid all invoices sent by Pacific Trail to C&F.  (Compl. at ¶ 22; Weaver Dep., p. 136.)

[2]  The fleet owners would get a lower price from the manufacturers than the manufacturers' own distributors due to the high volume of tires purchased for fleets.

[3]  LePore made money from Englewood Tires through a commission based program, (Boyle Dep., p. 21), but there is a dispute as to whether the Pacific Trail

informed Taylor that the Pacific Trail invoices were actually commission payments nor revealed that he owned Pacific Trail.  (LePore Dep., p. 107, 109-110.)

Nonetheless, because the price was the same as what LePore originally quoted for the tires, all was well with Taylor.  (Taylor Dep., p. 68.)  Taylor testified that he did not care how he was billed for the tires, because the amounts on the two invoices added up to the agreed upon price.  (Id.)  Frank Teten, Taylor's boss, knew about the two invoices, (id.), and did not inquire further because C&F was getting the tires so cheaply, $60 per tire below market price.  (Taylor Dep., p. 112; 81.)  Taylor testified that after he left C&F, when he found out that the $10 per tire was for commission, he was surprised but also did not see a difference to C&F.  (Taylor Dep., p. 83.)

In essence, then, Plaintiff alleges that LePore misrepresented to C&F that it was required to pay the Pacific Trail invoices in addition to the Englewood Tires invoices to receive the tires for which C&F had contracted, billing C&F about $265,000 for doing the work he was hired, and already paid, by Englewood Tires to do.  Thus, Plaintiff contends that it has been damaged in that it was deceived into paying about $265,000 worth of Pacific Trail invoices for services that were never provided and never needed to be provided.

The first count of the Complaint states that the Pacific Trail invoices were fraudulent in that they contained falsified information to represent that Pacific Trail had incurred freight costs that it actually had not incurred, as the freight charges had already been billed by Englewood Tires to C&F, and had already been paid.  (Compl. at ¶ 28.)

_____

invoices were approved of by Englewood Tires, (Boyle Dep., p. 35; LePore Dep., p. 61-67); Boyle has testified that Englewood Tires customers did not receive invoices representing sales commissions, (Boyle Dep., p. 26-27).

The second count of the Complaint states that the fraudulent acts of the three Defendants "constitute conversion," (Compl. at ¶ 33), and that Plaintiff, as the successor in interest to BFRC, has a right to the funds "stolen" by the Defendants which "consist of the wrongfully obtained payments for purported freight charges already paid" to Englewood Tires by BFRC, (Compl. at ¶ 34).

The third count of the Complaint is for conspiracy, stating that LePore and Furey conspired to perpetrate the fraud by misrepresenting Pacific Trail as a freight company and by issuing fraudulent invoices for payment by BFRC.  (Compl. at ¶ 37.)

Defendants counterclaimed for defamation and tortious interference, contending that the Complaint set forth false statements of theft and fraud with the intent to damage the business reputation of LePore or Pacific Trail.

<u>Summary Judgment Standard</u>

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." <u>Pearson v. Component Tech. Corp.</u>, 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)); <u>accord</u> Fed. R. Civ. P. 56 (c).  Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a

6

dispute about the fact might affect the outcome of the suit.  Id.  In determining whether

a genuine issue of material fact exists, the court must view the facts and all reasonable

inferences drawn from those facts in the light most favorable to the nonmoving party.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

       Initially, the moving party has the burden of demonstrating the absence of a

genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once

the moving party has met this burden, the nonmoving party must identify, by affidavits

or otherwise, specific facts showing that there is a genuine issue for trial.  Id.;

Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994).  Thus, to

withstand a properly supported motion for summary judgment, the nonmoving party

must identify specific facts and affirmative evidence that contradict those offered by the

moving party.  Andersen, 477 U.S. at 256-57.  "A nonmoving party may not 'rest upon

mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v.

Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting

Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)).  Indeed,

> the plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against a
> party who fails to make a showing sufficient to establish the existence of an
> element essential to that party's case, and on which that party will bear the
> burden of proof at trial.

Celotex, 477 U.S. at 322.

       In deciding the merits of a party's motion for summary judgment, the court's role

is not to evaluate the evidence and decide the truth of the matter, but to determine

whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

249 (1986).  Credibility determinations are the province of the factfinder.  Big Apple

BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

Discussion

**Standing**

As a threshold matter, Defendants have argued that Plaintiff lacks standing to bring this suit because it cannot establish injury in fact, causation, and redressability. BFNT is a successor in interest to the assets and liabilities of C&F, a store in Davenport, Iowa formerly owned by BFRC.[4]  Thus, the Court assumes that BFNT has intended to bring a claim that it contends BFRC could have brought as the "owner" of C&F, had BFRC discovered before selling C&F the true nature of the transactions involving Pacific Trail.  Otherwise, it would appear that there is no claim against the Defendants, as Plaintiff had no dealings with the Defendants that would give rise to this suit.  (As Defendants have argued, Plaintiff received no representation from Defendants because it was not "in the picture" during the relevant time.)

Indeed, in Defendants' Reply Brief, they acknowledge that their standing argument actually is not questioning BFNT's contractual status as assignee.  Rather, Defendants argue that BFRC suffered no injury in fact, so it had no viable claim of fraud to assign to BFNT when it assigned the assets and liabilities of C&F.  That is, there was no injury in fact suffered by the assignor BFRC.  The question at the heart of the case, then, is where was the fraud on BFRC that caused it injury?

---

[4]Although no evidence of the contractual transaction originally was submitted to the Court, there was no dispute that in July 2004, BFNT paid "book value" to acquire C&F from BFRC.  As part of its briefing in reply to the Defendants' opposition and cross-motion, Plaintiff supplied the July 8, 2004 Purchase Agreement whereby BFNT purchased from BFRC a GCR Tire Center located in Davenport, Iowa (C&F) and acquired all assets of BFRC related to the operation of C&F, including all claims and/or causes of action related to the operation of C&F.

**Fraud**

On the count of common law fraud, Plaintiff must establish that the Defendants caused Plaintiff damage by engaging in a material misrepresentation of a presently existing or past fact upon which Plaintiff reasonably relied, with knowledge or belief by the Defendants of its falsity, with an intention that Plaintiff rely on it.  See Gennari v. Weichert Co. Realtors, 691 A.2d 350, 367 (N.J. 1997) (citing Jewish Ctr. Of Sussex County v. Whale, 432 A.2d 521 (N.J. 1981) (finding the five elements of common-law fraud are: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages).

Plaintiff asserts that LePore misrepresented to Taylor that the Pacific Trail invoices were for brokerage and trans-loading fees when they were actually commissions to LePore.  LePore did not inform Taylor that the invoices represented commissions paid directly to LePore until after this lawsuit was filed and the majority of the invoices had been paid.  Plaintiff also argues that LePore misrepresented to C&F that it was required to pay the invoices in order to consummate the transaction and receive the tires for which it had contracted, when in reality only the Englewood Tires invoices should have been paid.

Next, Plaintiff argues that the misrepresentations were material because Frank Teten, Director of C&F and Controller for GCR Tire, testified that if he had known the invoices represented commission payments added "on the side" by LePore, a salesman for Englewood Tires, he would not have paid them, even though the total price was

9

equal to the quoted price for the tires.  (Teten Dep., p. 9, 12, 67-68.)  Teten later testified

that if the company was set up that way, if the company was aware of the situation, he

would not have a problem.  (Id., p. 68.)

Defendants do not squarely take issue with this argument, nor do they dispute

either that LePore knew of the falsity of his statements to Taylor that the Pacific Trail

invoices represented brokerage or trans-loading fees or that he intended that Taylor rely

on those statements.  Defendants argue instead that BFRC through GCR and/or C&F

could not have reasonably relied on any misrepresentation by Defendants because it

paid the invoices at the agreed upon price, received the tires, and resold them at

substantial profit.  Defendants further argue that C&F was aware it would receive two

invoices totaling the agreed upon price, one for tires and freight, and the other for a

brokerage/trans-loading fee.[5]  Thus, it did not make a difference whether the second

invoice was for commissions or brokerage/trans-loading, as the bills were paid at the

price agreed upon by Taylor and LePore.  In short, Defendants contend that C&F relied

on LePore's representations of the total price of the tires, but not on the line items

comprising that purchase price.[6]

---

[5]  Defendants assert that the issue of whether Englewood Tires permitted and
agreed to two separate invoices (sent in the same envelope) or permitted LePore to
charge "brokerage/trans-loading fees" was settled by mediation of a prior State court
action between LePore and Englewood Tires.  LePore contends that he had the
permission and involvement of John Boyle, owner of Englewood Tires, but Boyle has
testified to the contrary.

[6]As further argued by Defendants, if any overpayment on the book value of
inventory occurred, "the cause was BFNT's failure to properly valuate BFRC's assets
prior to consummating the purchase agreement.  Defendant could not cause BFNT to err
in its valuation of BFRC's assets by selling tires to BFRC in the desired quantity at a
mutually agreed upon price.  Therefore, there is no causal connection between the
conduct of the Defendant and the injury alleged by BFNT."  Def. Reply Br. [47], p. 5.

C&F manager John Taylor testified repeatedly to that effect:

> You see, when Frank first came to me, he told me, I'll sell you a 1124.5 tire for $210. And I says, how many do you got? I'll buy all you can supply. So he would call me up and he says, I have 570. I'll take them. When the bills came in, there was so much for the tire, which would be $200, a $10 transloading fee, which equaled $210. It was exactly what I agreed to pay. Now I know at the time, the first time I got a bill, I asked him about that, and he said, It's a transloading fee. Period. I didn't ask any more and I said okay. It came up to the price that I agreed to pay.

(Taylor Dep., p. 67-68.)

> How he billed me – I cared less how he billed me for the tire. We were getting these bills, he said from Englewood and from Pacific Trail. It added up to the amount that I agreed. My boss knew about it.
> In fact, auditors – Firestone Tire & Rubber Company auditors came in and asked me on more than one occasion about that, and I explained it to them. They said okay.

(Taylor Dep., p. 68.)

> I have no idea where [the transloading fees versus commission] would bear on the price that Firestone paid for those tires, because we bought those tires way below the market and making lots of money.

(Taylor Dep., p. 83.)

> Why would I ask [LePore why he did not tell me of his association with Pacific Trail]? It's none of my business. If he was making this money as a commission and if he's making it now because the tires are the same price, I care less.
> I was just getting the tires at one hell of a price, and that's all I cared about. I didn't care if he was making – I mean, obviously, I knew somebody had to be making money on this or they wouldn't do it.

(Taylor Dep., p. 87-88.)

> [I]t was under my assumption that I was getting a bill from Englewood for the tires and a bill from Pacific Trail on the transloading fee. You can't seem to get that. I've said it a hundred times today. That's what I thought it was. . . . [I told Frank Teten] we're getting two bills on these Michelin tires. One's for transloading and one's for the tires and the freight costs . . . but they're coming in at exactly the same price quoted.

(Taylor Dep., p. 88-89.)

11

> [T]he two bills added up to the amount of money we agreed to pay for the tires, which is, as I said over and over and over, way below market, and Firestone made tons of money on them.

(Taylor Dep., p. 90.)

Even if there is a question of fact as to whether there was reasonable reliance because Teten testified that he would not have authorized payment for "commissions," Plaintiff lacks the requisite proof of resulting damages. As explored during oral argument, it would be difficult to find that a fraud was perpetrated where the Plaintiff's predecessor in interest was a contracting party that agreed to a certain price, received exactly what it bargained for, resold at a profit, and did not rely on any of the alleged misrepresentations to its detriment. There may have been misrepresentations, but there simply was no damage. Accordingly, summary judgment must be granted on the fraud count of the Complaint.

**Count Two**

Next, Plaintiff argues that it is entitled to summary judgment on the second count of the Complaint for unjust enrichment. The second count of the Complaint, however, states a claim for conversion, and Defendants have argued that Plaintiff has not demonstrated their conversion of any asset belonging to Plaintiff. As stated above, the second count of the Complaint states that the fraudulent acts of the three Defendants "constitute conversion," (Compl. at ¶ 33), and that Plaintiff, as the successor in interest to BFRC, has a right to the funds "stolen" by the Defendants which "consist of the wrongfully obtained payments for purported freight charges already paid" to Englewood Tires by BFRC, (Compl. at ¶ 34). Moreover, Magistrate Judge Ann Marie Donio, in denying the Defendants leave to amend the Counterclaim on August 3, 2006, characterized the claim as one for civil conversion.

12

"The elements of common law conversion under New Jersey law are (1) the existence of property, (2) the right to immediate possession thereof belonging to plaintiff, and (3) the wrongful interference with that right by defendant." Corestar Intern. Pte. Ltd. v. LPB Communications, Inc., 513 F. Supp. 2d 107, 127 (D.N.J. 2007) (citing Carton v. Choice Point, 450 F. Supp. 2d 489, 501 (D.N.J. 2006)). Plaintiff has argued that the Defendants' fraud resulted in the conversion and use of monies to which they were not entitled, but Plaintiff has not made out a case for conversion here.

Not only has Plaintiff failed to establish a claim for conversion, but also there is no unjust enrichment, as no benefit was conferred upon the Defendants separate and apart from what was negotiated with Taylor on behalf of C&F. "To establish a claim for unjust enrichment, 'a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust.'" Iliadis v. Wal-Mart Stores, Inc., 922 A.2d 710, 723 (N.J. 2007) (citing VRG Corp. v. GKN Realty Corp., 641 A.2d 519 (1994)). "Recovery under a theory of unjust enrichment is not appropriate, however, when a valid, unrescinded contract governs the rights of the parties." Corestar Intern. Pte. Ltd. v. LPB Communications, Inc., 513 F. Supp. 2d 107, 127 (D.N.J. 2007) (citing Van Orman v. American Ins. Co., 680 F.2d 301, 310 (3d Cir. 1982)).

Here, again, C&F had the right to receive the benefit of its bargain with LePore, and it did so. The Court acknowledges BFNT's argument, that it paid the Pacific Trail invoices but Pacific Trail never provided any service, whether characterized as brokerage, trans-loading, or freight, but finds that Plaintiff cannot maintain a claim for unjust enrichment, which was never asserted in the Complaint, and summary judgment must be entered in favor of the Defendants on Count Two.

13

**Conspiracy**

Finally, Plaintiff argues that judgment should be entered in its favor on the claim of civil conspiracy by the three Defendants.  Defendants, on the other hand, contend that there is no proof of any illegal or unlawful action beyond invoicing for services rendered at an agreed upon price except that the invoices "appeared" to be freight bills.

"A civil conspiracy is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, a principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.'" <u>Banco Popular N. Am. v. Gandi</u>, 876 A.2d 253, 263 (N.J. 2005) (citation omitted).

Plaintiff urges this Court to find that there was a conspiracy "to obtain, via various material misrepresentations, money to which Defendants were not entitled and to convert that money for their own use – all the while concealing the connection between LePore and Pacific Trail from the Davenport Store."  (Pl. Reply Br., p. 20.) Plaintiff points out that Furey was not an officer of Pacific Trail, but was a signatory on the bank account for the convenience of her husband, and as such she wrote checks for him and several checks were written to her in amounts ranging from $375 to $10,000. (Lorraine LePore Dep., p. 42, 97, 61-74.) Although she cannot recall what the checks were for, she endorsed and deposited them into the bank account she shared with LePore.  (Lorraine LePore Dep., p. 61-74.)  There is no record evidence, however, that the Defendants committed an unlawful act or otherwise utilized unlawful means. Accordingly, summary judgment must be granted against Plaintiff on this claim.

14

**Counterclaim**

Plaintiff seeks summary judgment in its favor on both counts of the Counterclaim.  It argues that the claim of defamation is not actionable as a matter of law because there was no false or defamatory statement made.  New Jersey courts define defamation in accordance with the Restatement (Second) of Torts (1977).  <u>DeAngelis v. Hill</u>, 847 A.2d 1261, 1267-68 (N.J. 2004).  "The Restatement provides that in addition to damages, the elements of a defamation claim are: (1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting at least to negligence by the publisher."  <u>Id.</u> (citing *Restatement (Second) of Torts,* § 558).  Although Defendants make vague reference to Plaintiff's allegedly defamatory statements[7] that LePore had defrauded BFNT and that he may not have paid excise tax, (LePore Dep., p. 275), they have failed to carry their burden to survive summary judgment on an independent claim of defamation.

Finally, Defendants seek summary judgment on their counterclaim that Plaintiff engaged in a concerted effort to interfere with Defendants' prospective economic advantage and business activity.  They contend that using Pacific Trail, LePore purchased large numbers of Michelin truck and other tires from non-manufacturer secondary sources at prices lower than the dealers could purchase them from the manufacturers, and then he sold the tires below the market price charged by BFNT.

---

[7]  LePore testified that he believes Art Campanoni, Kurt Danielson, and Randy Lopez of BFNT mentioned the instant lawsuit to dealers including Deronde Tire, Mike Chazen at Hempstead Tire, and Southeast Tire.  (LePore Dep., p. 275.)

Defendants allege that BFNT purchased C&F to eliminate those below market price sales. Indeed, Plaintiff's corporate representative testified, "I think it would be fair to say that the purpose of the acquisition was to end gray marketing and show Bridgestone's commitment to adherence to accepted marketing practices within our industry." (Weaver Dep., p. 43-45.) Thus, Defendants assert that Plaintiff intentionally interfered with the alleged "grey marketing" of Pacific Trail (by "using untrue, defamatory, and threatening statements in the marketplace" including that LePore had defrauded Plaintiff and may not have paid excise tax).

There is no evidence of untrue statements having been made by Plaintiff, nor have Defendants established the elements of tortious interference. In order establish the counterclaim for tortious interference with contract and/or prospective business relationships, Defendants must prove: (1) that Defendants had a reasonable expectation of an economic benefit or advantage; (2) that Plaintiff knew of Defendants' expectancy; (3) that Plaintiff wrongfully and intentionally interfered with this expectancy; (4) a reasonable probability that but for Plaintiff's wrongful interference, Defendants would have realized the economic benefit; and (5) that Defendants were injured as a result of Plaintiff's conduct. Carpet Group Intern. v. Oriental Rug Importers Ass'n, Inc., 256 F. Supp. 2d 249, 287-88 (D.N.J.2003) (citations omitted). Obviously, upon acquiring C&F, it was Plaintiff's prerogative to end the gray marketing practice engaged in by the store. Defendants have submitted no legal support for any contention that Plaintiff's actions in closing the loophole here were wrongful. In addition, there is no evidence in the record before the Court that Defendants were injured as a result of Plaintiff's purchase and closure of C&F. As such, summary judgment will be granted on the Counterclaim.

16

<u>Conclusion</u>

For the reasons set forth above, as well as those placed on the record during oral argument on December 11, 2007,

IT IS ORDERED on this 17th day of December, 2007 that Plaintiff's motion for summary judgment [35] is hereby <u>GRANTED IN PART AND DENIED IN PART</u> in that summary judgment is granted in favor of the Plaintiffs on the Counterclaim, but denied on the Complaint.

IT IS FURTHER ORDERED that Defendants' cross-motion for summary judgment [39] is hereby <u>GRANTED IN PART AND DENIED IN PART</u> in that summary judgment is granted in favor of the Defendants on the Complaint, but denied on the Counterclaims.

     /s/ Joseph H. Rodriguez
JOSEPH H. RODRIGUEZ
U.S.D.J.